T.C. Memo. 2013-121

UNITED STATES TAX COURT

DANNY LANE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16602-10L.                     Filed May 6, 2013.

<u>Richard L. Pyper</u>, for petitioner.

<u>Marshall R. Jones</u>, for respondent.

MEMORANDUM OPINION

CHIECHI, <u>Judge</u>:  This case is before us on respondent's motion for

summary judgment (respondent's motion).[1]  We shall deny respondent's motion

_____

[1]Petitioner filed a response to respondent's motion, and respondent filed a
reply to petitioner's response.

**[*2]** and remand this case to respondent's Appeals Office (Appeals Office).[2]

<u>Background</u>

The record establishes and/or the parties do not dispute the following.

Petitioner resided in Alabama at the time he filed the petition.

At all relevant times, petitioner was engaged in the business of commercial real estate construction. He conducted that business as a sole proprietorship under the name D & L Construction.

Petitioner filed late (1) Form 940-EZ, Employer's Annual Federal Unemployment (FUTA) Tax Return (Form 940-EZ), for each of his taxable years 2003 and 2005 and (2) Form 941, Employer's Quarterly Federal Tax Return (Form 941), for each of the 20 consecutive quarters that began on January 1, 2003, and that ended on December 31, 2007. Petitioner also paid late the respective Federal taxes (taxes in question) that he owed for those respective taxable periods.[3]

---

[2]All section references are to the Internal Revenue Code in effect at all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Petitioner paid the taxes in question (1) on March 27, 2008, for his taxable year 2003 and for the eight consecutive quarters that began on January 1, 2003, and that ended on December 31, 2004; (2) on April 29, 2008, for his taxable year 2005 and for the seven consecutive quarters that began on January 1, 2005, and that ended on September 30, 2006; (3) on July 28, 2008, for the quarter that began on October 1, 2006, and that ended on December 31, 2006; and (4) at a time not

(continued...)

[*3] However, he has not paid any additions to, and/or any penalties on, the taxes in question or interest as provided by law. (We shall refer to any such additions and/or any such penalties and interest as provided by law as petitioner's unpaid liabilities at issue.)

On July 1, 2008, respondent issued to petitioner two separate notices of Federal tax lien filing and your right to a hearing under IRC 6320 (notices of tax lien). One of those notices pertained to petitioner's 15 consecutive quarterly periods that began on January 1, 2003, and that ended on September 30, 2006, for which he filed Forms 941. The second of those notices pertained to (1) petitioner's annual periods 2003 and 2005, for which he filed Forms 940-EZ, and (2) petitioner's five consecutive quarterly periods that began on October 1, 2006, and that ended on December 31, 2007, for which he filed Forms 941.

Richard L. Pyper (Mr. Pyper), petitioner's authorized representative, timely submitted to respondent petitioner's Form 12153, Request for a Collection Due Process or Equivalent Hearing (petitioner's Form 12153), and requested a hearing with the Appeals Office. In that form, Mr. Pyper indicated that petitioner

---

[3](...continued)
established by the record after July 28, 2008, and before February 24, 2009, for the four consecutive quarters that began on January 1, 2007, and that ended on December 31, 2007.

[*4] disagreed with the notices of tax lien and indicated that petitioner intended to propose an offer-in-compromise as a collection alternative.

On February 24, 2009, Mr. Pyper attended a face-to-face hearing (hearing) with respondent's settlement officer who was assigned petitioner's Form 12153 (settlement officer). At that hearing, Mr. Pyper submitted to the settlement officer Form 656, Offer in Compromise (Form 656). In that form, petitioner proposed to settle petitioner's unpaid liabilities at issue by paying a total of $100,000, with $20,000 to be paid at the time he submitted his offer and the remaining $80,000 to be paid in five monthly installments of $16,000 (petitioner's offer-in-compromise). Petitioner indicated in Form 656 that he was proposing an offer-in-compromise because of "Doubt as to Collectibility--'I have insufficient assets and income to pay the full amount.'" According to petitioner,

> Market conditions were responsible for my failure to pay the employment taxes on time. However, I have since made all required payroll tax payments and the only outstanding obligation owed by me is for penalties and interest applicable to the unpaid taxes. Due to continuing deterioration in the current construction market, it is doubtful that I will be in any position for the next several years to make payments in excess of what I have proposed here. FYI: This is the worst economy I have seen in 40 years; I have not shown a profit since 2000 and am just keeping my business open to keep my reputation intact in case there is a recovery.

**[*5]** At the hearing with the settlement officer, Mr. Pyper provided her petitioner's Form 433-B, Collection Information Statement for Businesses (petitioner's first Form 433-B). In that form, petitioner showed, inter alia, gross business income and business expenses of $87,063 and $82,665.94, respectively, for the period that began on November 30, 2008, and that ended on December 31, 2008. In petitioner's first Form 433-B, petitioner also showed the following business assets and his equity therein:[4]

| Asset | Equity |
|-------|--------|
| Business bank accounts | $12,685.24 |
| Accounts/notes receivable | 87,063.00 |
| Vehicles | 9,390.00 |
| Business equipment | 115,334.45 |

On February 16, 2010, the settlement officer sent a written preliminary assessment of petitioner's offer-in-compromise to Mr. Pyper. That preliminary assessment included the following so-called Asset/Equity Table and so-called Income/Expense Table:

---

[4]Except for petitioner's business bank accounts, the record does not establish the respective dates as of which petitioner showed his equity in the various assets that he held.

**[*6]** Asset/Equity Table

| Item | Fair Market Value | % Reduced | Quick Sale Value | Encumbrances | Equity |
|---|---|---|---|---|---|
| * | * | * | * | * | * |
| Checking account | $17,812 | 0% | $17,812 | | $17,812 |
| * | * | * | * | * | * |
| Vehicle 1-2002 Chev | 1,800 | 20% | 1,440 | | 1,440 |
| Vehicle 2 - 2003 Ford | 2,160 | 20% | 1,728 | | 1,728 |
| Vehicle 3 - 2004 Ford | 2,480 | 47% | 1,314 | | 1,314 |
| Equipment/tools | 115,334 | 20% | 92,268 | | 92,268 |
| * | * | * | * | * | * |
| Accounts receivable | 87,063 | | 87,063 | | 87,063 |
| Vehicle 4 - 2004 Ford | 2,950 | 20% | 2,360 | | 2,360 |
| Totals | 229,599 | | 203,985 | --- | 203,985 |

**[*7]** Income/Expense Table

\*  \*  \*  \*  \*  \*  \*

| Total Income | | Necessary Business Expenses | | |
| --- | --- | --- | --- | --- |
| Source | Gross | Expense | Claimed | Allowed |
| 19. Gross receipts | $87,063 | 27. Materials purchased | $41,836.47 | $41,836.47 |
| 19a. Returns & Allowance * * * | | 28. Inventory purchased | | |
| 19b. Cost of Goods Sold * * * | | 29. Gross wages & salaries | 11,347.00 | 11,347.00 |
| 20. Gross rental income | | 30. Rent | 400.00 | 400.00 |
| 21. Interest | | 31. Supplies | 246.05 | 246.05 |
| 22. Dividends | | 32. Utilities/telephone | 723.69 | 723.69 |
| 23. Other income (specify below) | | 33. Vehicle gasoline/oil | 2,961.05 | 2,961.05 |
| | | 34. Repairs/maintenance | 11,837.05 | 11,837.05 |
| | | 35. Insurance | 3,181.09 | 3,181.09 |
| | | 36. Current taxes | 1,060.91 | 1,060.91 |
| | | 37. Other expenses * * * | 9,072.63 | |
| \* \* \* | | \* \* \* | \* | \* |
| 26. Total income | $87,063 | 39. Total expenses | $82,666 | $73,593.37 |
| | | NET DIFFERENCE (Line 26 minus line 39) * * * | | $13,469.63 |
| \* \* \* | | \* \* \* | \* | \* |

Monthly net difference is $13,469.63 x 48 months (cash offer) equals $646,542.

**[*8]** On March 4, 2010, Mr. Pyper sent a letter (March 4, 2010 letter) to the settlement officer by facsimile (fax) in which he responded to her preliminary assessment of petitioner's offer-in-compromise. That letter stated in pertinent part:

> Item # 1. Form 433-A, Line 37, Accounts Receivable. *You have treated these amounts as contributing to your analysis of the Asset Equity Table ("AET") pertaining to the taxpayer, but your analysis is flawed.*
>
> **Response # 1:**
>
> Under Alabama law a subcontractor has a so called "mechanics lien" on all services and materials that are committed to a particular job. In the instant case, these Accounts Receivable are already earmarked for payment to Mr. Lane's various subcontractors before they are submitted to his customers. In reality his share of the proceeds historically runs about 10%. Due to Mr. Lane's tax problems, the customer normally issues a check in payment on account in the names of Mr. Lane and his subcontractor(s), so that he must remit the proportional share to the subcontractor in order to maintain his credibility with his customers. When you take the accounts receivable off your calculation of the AET, the remaining balance (±$116,000) approximates the amount the taxpayer has offered to pay per his OIC [offer-in-compromise].
>
> \*      \*      \*      \*      \*      \*      \*
>
> Item # 4. Liquidation of Equipment. *Your analysis presupposes that Mr. Lane could liquidate most of his operating assets to meet his liabilities without incurring serious damage to his ability to remain in business.*

**[*9]**      **Response # 4.**

       If the taxpayer had to immediately liquidate his equipment to meet his obligations to the Internal Revenue Service this would place an unreasonable burden on him because it would essentially mean he would have to go out of business. Without this equipment he could not secure additional, meaningful work and would have to lay off employees and resort to government support himself. The equipment is essential to staying in business. I don't believe the current political and economic objectives of the U.S. Government is to force small businessmen, like the taxpayer, to go out of business and add more workers to the unemployment roles.

On March 9, 2010, the settlement officer sent a letter (March 9, 2010 letter) to Mr. Pyper in response to his March 4, 2010 letter. That letter stated in pertinent part:

I am in receipt of your letter that was faxed to Appeals on 03/04/2010.

Accounts and notes receivable are considered assets. The value of the accounts and notes receivable are determined by what is collectible from the borrower, what can be levied upon and what is secured and if so by what assets. Per the information reviewed, the accounts and notes receivable reported on the Form 433-B can be collected per the services rendered by D & L Construction. The amount owed to D & L Construction can be levied upon for payment of the taxes owed. The accounts and notes receivable will not be disregarded for the computation of an acceptable offer.

    *       *       *       *       *       *       *

**[*10]** D & L Construction is a sole proprietor[ship]. Therefore, I have enclosed Form 433-A, Collection Information Statement for completion since Mr. Lane is the sole owner of this business. The taxes can also be collected from his personal assets as well as the business assets. Please complete and return the Form 433-A to me with the applicable attachments no later than 3/26/2010.

Inventory, machinery and equipment are assets of the business. Therefore, their values are included in the computation of an offer. It is noted that an exemption of $4,120 will be deducted from the total of equity shown in the equipment and tools on the AET [Asset/Equity Table].

On March 26, 2010, Mr. Pyper sent a letter (March 26, 2010 letter) to the settlement officer by fax in response to her March 9, 2010 letter. That letter stated in pertinent part:

> This letter is intended as a proportional response to your recent comment regarding the right to consider the gross amount of accounts receivable the taxpayer described on the Form 433-B that was submitted in conjunction with his OIC [offer-in-compromise] a year ago. I thought the response #1 in my letter dated March 4, 2010, was sufficient to apprise you of your misapprehension as contained in the analysis of the Asset Equity Table ("AET"), but apparently I did not do a credible job of explaining the unique relationship that exists among general contractors and subcontractors ("the subs") under Alabama law. Therefore, please consider the following:
>
>> A. Specifically, the amount reported on Form 433-B did not reflect the fact that 90% of the amount reported was not owed to Mr. Lane but was owed to the various subcontractors hired my [sic] Mr. Lane to provide certain services and materials for the project awarded to Mr. Lane. In that context he was merely ***acting as their agent*** in securing a payment and could not apply the funds for any other purpose because the

[*11] subs possessed a <u>mechanics lien</u> which automatically attached itself to the funds the moment they were remitted to Mr. Lane in satisfaction of the account receivable. To be absolutely correct the amount shown as an account receivable on the From [sic] 433-B should have been $8,706.30 instead of the $87,063 that was reported. Mr. Lane thought the Internal Revenue Service would recognize this fact when it was originally reported, but there have been other instances when the I.R.S. has failed to recognize a lien authorized under Alabama law. * * * This is the routine way in which subcontractor obligations and vendor debts are handled and conforms to industry standards.

On March 30, 2010, the settlement officer sent a letter to Mr. Pyper by fax in response to his March 26, 2010 letter. That letter stated in pertinent part:

Per review of the information recently received, an updated Form 433-B, Collection Information Statement for Businesses can be submitted by 04/07/2010.

Per review of the [petitioner's first] Form 433-B, the amount of $87,063 is the total of the accounts receivable. Per page 6 of the [petitioner's first] Form 433-B, the amount of $87,063 on line 25 is the total of the accounts receivable reported as monthly income. The total of expenses claimed was deducted from that amount. The expenses would have included any subcontractors, employees, etc that were owed. This amount deleted from the Asset and Equity table leaves a balance of $112,802.

*     *     *     *     *     *     *

Also, Mr. Lane is a sole proprietor (owns 100% of his business), but we did not include any of his personal assets on the Asset and Equity table. The tax can be collected from his personal and business assets. I need a copy of the mortgage coupon, etc (which shows the value

**[*12]** and the balance due on his personal residence). This information may be submitted with the updated Form 433-B by 04/07/2010.

On April 6, 2010, Mr. Pyper submitted to the settlement officer an updated Form 433-B (petitioner's second Form 433-B). In that form, petitioner showed, inter alia, gross business income and business expenses of $26,560 and $24,929.43, respectively, for the period that began on February 28, 2010, and that ended on March 31, 2010. In petitioner's second Form 433-B, petitioner also showed the following business assets[5] and his equity therein:[6]

| Asset | Equity |
|---|---|
| Business bank accounts | $4,958.00 |
| Accounts/notes receivable | 26,560.00 |
| Real property | 25,000.00 |
| Vehicles | 9,390.00 |
| Business equipment | 115,334.45 |

---

[5]One of the assets that petitioner listed in petitioner's second Form 433-B was his residence on which there were certain mortgage loans. It was at the request of the settlement officer that petitioner showed as an asset in that form his residence and his equity therein even though that residence was not a business asset of petitioner.

[6]Except for petitioner's business bank accounts, the record does not establish the respective dates as of which petitioner showed his equity in the various assets that he held.

[*13] On May 21, 2010, the settlement officer sent a letter (May 21, 2010 letter)

to Mr. Pyper. That later stated in pertinent part:

> The information received did not change the Reasonable Collection
> Potential on Mr. Lane's case.
>
> *   *   *   *   *   *   *
>
> The offer in the amount of $100,000 is rejected. The taxes may be
> paid by way of an installment agreement of approximately $6000 a
> month and by borrowing on assets of the business and individually to
> reduce the balance to include in an installment agreement.
>
> You may notify me no later than 06/07/2010 if you wish to consider
> the above as a collection alternative on your case. Otherwise, your
> case will be closed and a determination letter will be issued.

On June 8, 2010, Mr. Pyper sent a letter (June 8, 2010 letter) to the

settlement officer by fax in response to her May 21, 2010 letter. That letter stated

in pertinent part:

> This is in response to your letter dated May 21, 2010. There is
> some uncertainty regarding the proposal of $6,000 per month. If this
> is not a modification of the taxpayer's OIC, what is the time period
> for making such monthly payments?
>
> A monthly payment of $6,000, if made with current cash flow,
> would obviously be "after tax" which equates to a gross earnings of
> close to $10,000 per month "before tax". What information has been
> submitted to you suggesting the taxpayer has this kind of cash flow
> available for such a string of indeterminate payments during this time
> of extreme economic hardship for most businesses involved in the
> construction industry? Please advise.

**[*14]**      Since it appears on its face this is not a modification of * * *
Mr. Lane's OIC, unless we are mistaken, the taxpayer must
respectfully decline the proposal and will await the receipt of your
determination.

On June 9, 2010, the settlement officer sent a letter to Mr. Pyper in response

to his June 8, 2010 letter.  That letter stated in pertinent part:

> Per your letter received via fax on today, a review of the bank
> statements received indicate that an installment payment in the
> amount of $6000 could be made on the tax liabilities.
>
> The offer in the amount of $100,000 is rejected.  You will receive my
> determination in writing and have the opportunity for judicial review
> if desired.

On June 23, 2010, respondent issued to petitioner two separate notices of

determination concerning collection action(s) under section 6320 and/or 6330

(notices of determination).  One of those notices pertained to petitioner's annual

periods 2003 and 2005, for which he filed Forms 940-EZ.  The second of those

notices pertained to petitioner's 20 consecutive quarterly periods that began on

January 1, 2003, and that ended on December 31, 2007, for which he filed Forms

941.  Each of those notices stated in pertinent part:

> **Summary of Determination**
> The filing of the Notice of Federal Tax Lien is appropriate, given the
> facts and circumstances of your case.  The requirements of applicable
> law and administrative procedures have been met and the action taken
> was appropriate under the circumstances.

[*15] We could not accept your collection alternative of an offer-in-compromise because the Service can reasonably expect to collect an amount larger than you offered.

Since were unable to accept your offer and you did not propose another viable collection alternative, retaining the Notice of Federal Tax Lien balances the need for the efficient collection of the taxes with your concern that any collection action be more intrusive than necessary.

Each of the notices of determination included an attachment that stated in

pertinent part:

### SUMMARY AND RECOMMENDATION

You filed a request for a Collection Due Process (CDP) hearing under Internal Revenue Code § 6320 following receipt of Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing. Your Form 12153, requesting a CDP hearing was timely received on 07/31/2008 within the 30-day period for requesting a hearing.

The filing of the Notice of Federal Tax Lien is appropriate, given the facts and circumstance of your case as discussed below.

### BRIEF BACKGROUND

The taxes due are a result of insufficient federal tax deposits being made when they were due. The notices of the taxes being due were sent to you at your last known address of record.

You stated on the Form 12153 that you will submit an offer-in-compromise as a collection alternative. You submitted an offer and it was investigated. It was determined that the amount you offer was less than your reasonable collection potential. Therefore, we could not accept your offer. You were informed that you may consider an installment agreement as a collection alternative. You disagreed with

[*16] the amount proposed as an installment agreement and you did not propose an amount that could be accepted per the amount of taxes owed on your account, therefore, no alterative to collection was granted on your case.

Agreements are based on your ability to fully pay the taxes within the statutory period for collection which is 10 years from the date of assessment of the tax.

You were offered a face-to-face, telephonic or correspondence conference by letter dated 1/29/2009.  Your representative requested and received a face-to-face conference.

## DISCUSSION AND ANALYSIS

a. Verification of legal and procedural requirements:

Appeals has obtained verification from the IRS office collecting the tax that the requirements of any applicable law, regulation or administrative procedure with respect to the proposed levy or NFTL filing have been met.  Computer records indicate that the notice and demand, notice of intent to levy and/or notice of federal tax lien filing, and notice of a right to a Collection Due Process hearing were issued.

Assessment was properly made per IRC § 6201 for each tax and period listed on the CDP notice.

The notice and demand for payment letter was mailed to your last known address, within 60 days of the assessment, as required by IRC § 6303.

There was a balance due when the CDP levy notice was issued or when the NFTL filing was requested.

**[*17]** Letter 3172 was sent by certified mail to the your last known address per records of the Automated Lien System, no later than 5 business days after the NFTL was recorded (IRC § 6320(a)).

There is no pending bankruptcy case, nor did you have a pending bankruptcy case at the time the CDP notice was sent.

**Prior involvement**:
I had no prior involvement with respect to the specific tax periods either in Appeals or Compliance.

**Collection statute verification**:
The collection statute has been suspended; the collection period allowed by statute to collect these taxes has been suspended by the appropriate computer codes for the tax periods at issue.

Collection followed all legal and procedural requirements and the actions taken or proposed were appropriate under the circumstances.

## Issues raised by the taxpayer

**Collection Alternatives Offered by Taxpayer**
You requested the collection alternative of an offer-in-compromise. We considered your request but determined that the offer was not a viable collection alternative on your case.

You offered to pay $100,000 as a lump sum cash offer. You submitted $20,000 with the offer (20%) and upon written acceptance of the offer the balance ($80,000) would be paid in 5 installments of $16,000.

An offer-in-compromise reasonable collection potential is base on your equity in assets and ability to make future payments on the taxes due.

**[*18]** A review of the financial information and documentation you provided, your reasonable collection potential was calculated to be $278,117.96 as shown below;

Asset/Equity table

| Item | Fair Market Value | % Reduced | Quick Sale Value | Encumbrances | Equity |
|---|---|---|---|---|---|
| * | * | * | * | * | * |
| Checking Account | $17,812 | 0% | 17,812 | | 17,812 |
| * | * | * | * | * | * |
| Vehicle 1-2002 Chev | $1,800 | 20% | 1,440 | | 1,440 |
| Vehicle 2- 2003 Ford | $2,160 | 20% | 1,728 | | 1,728 |
| Vehicle 3- 2004 Ford | $2,480 | 47% | 1,314 | | 1,314 |
| Equipment/Tools | $115,334 | 20% | 92,268 | 4,120 | 88,148 |
| * | * | * | * | * | * |
| Accounts Receivable | $87,063 | | 87,063 | | 87,063 |
| Vehicle 4- 2004 ford | $2,950 | 20% | 2,360 | | 2,360 |
| Totals | $229,599 | | 203,985 | 4,120 | 199,865 |

The above information does not include the assets that belong to you individually because you did not provide this information. The information is based on what you reported on the [petitioner's first] Form 433-B and the documentation attached to verify the values and encumbrances on the assets. Your equity in assets was calculated to be $199,865.

[*19] The Income/Expense table below is also based on the revised [petitioner's second] Form 433-B, Collection Information for Businesses, dated and signed by you on 03/31/2010.

### Income/Expense Table (IET) For Corporations & Partnerships

\*    \*    \*    \*    \*    \*    \*

| Income Total | | | Necessary Business Expenses | | |
|---|---|---|---|---|---|
| Source | Gross | | | Claimed | Allowed |
| 19. Gross Receipts | 26,560 | 27. Materials Purchased | | $1,518.37 | $1,518.37 |
| 19a. Returns & Allowance * * * | | 28. Inventory Purchased | | | |
| 19b. Cost of Goods Sold * * * | | 29. Gross Wages & Salaries | | 11.224.00 | 11,224.00 |
| 20. Gross Rental Income | | 30. Rent | | 500.00 | 500.00 |
| 21. Interest | | 31. Supplies | | | |
| 22. Dividends | | 32. Utilities/telephone | | 674.67 | 674.67 |
| 23. Other income (specify below) | | 33. Vehicle Gasoline/Oil | | 2850.96 | 2850.96 |
| | | 34. Repairs/Maintenance | | 2933.38 | 2933.28 |
| | | 35. Insurance | | 1983.27 | 1983.27 |
| | | 36. Current Taxes | | 3244.88 | 3244.88 |
| | | 37. Other Expenses * * * | | | |
| \*    \*    \* | \* | \* | \* | \* | \* |
| 26. Total Income | $26,560 | 39. Total Expenses | | $24,929.43 | $24,929.43 |
| | | NET DIFFERENCE (Line 26 minus line 39) * * * | | | $1630.57 |
| \*    \*    \* | \* | \* | \* | \* | \* |

The amount of $1630.57 x 48 months (cash offer) = $78,252.96

[*20] The total of equity in assets plus future potential income is a total of $278,117.96 which is more than the $100,000 offered.

As stated earlier, you were requested to submit Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals per letter dated 03/09/2010. The Form 433-A was not received. The Form 433-A is required when evaluating a sole proprietor for any collection alternative. Therefore, the above computations do not include any assets or additional income you have personally.

Since we could not accept your offer in the amount of $100,000 the filing of the Notice of Federal Tax Lien is appropriate, given the facts and circumstance of your case.

**Challenges to the Existence of Amount of Liability**
You did not dispute your liabilities.

**You raised no other issues:**

**Balancing of need for efficient collection with taxpayer concern that the collection action be no more intrusive than necessary.**

I balance the competing interests in finding the lien appropriate. Given your failure to propose a viable collection alternative that could be accepted at this time, retaining the filed lien balances the need for the efficient collection of the taxes with your concern that any collection action be no more intrusive than necessary. [Reproduced literally.]

## Discussion

We may grant summary judgment where there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b);

**[\*21]** <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994).

Where, as is the case here, the validity of the underlying tax liability is not properly placed at issue, we review the determination of the Commissioner of Internal Revenue for abuse of discretion. <u>See</u> <u>Sego v. Commissioner</u>, 114 T.C. 604, 610 (2000); <u>Goza v. Commissioner</u>, 114 T.C. 176, 182 (2000).

Section 7122(a) authorizes the Secretary of the Treasury (Secretary) to compromise, inter alia, any civil case arising under the internal revenue laws. Section 7122(d)(1) requires the Secretary to prescribe guidelines for officers and employees of the Internal Revenue Service to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute. Section 301.7122-1(b)(2), Proced. & Admin. Regs., provides that doubt as to collectibility is a ground for the compromise of a liability.[7] Section 301.7122-1(b)(2), Proced. & Admin. Regs., provides that "Doubt as to collectibility exists in any case where the taxpayer's assets and income are less than the full amount of the liability."

---

[7]Sec. 301.7122-1(b)(1) and (3), Proced. & Admin. Regs., also provides that doubt as to liability and the promotion of effective tax administration are grounds for the compromise of a liability. Petitioner does not claim that he qualifies for an offer-in-compromise on either of those two grounds.

[*22] Respondent has prescribed procedures that are consistent with section 7122 and the regulations thereunder in order to determine whether an offer-in-compromise based on doubt as to collectibility should be considered and accepted. Consistent with section 301.7122-1(b)(2), Proced. & Admin. Regs., section 4.02 of Revenue Procedure 2003-71, 2003-2 C.B. at 517, provides that an offer-in-compromise based on doubt as to collectibility "generally will be considered acceptable if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the Service could collect through other means, including administrative and judicial collection remedies." An offer-in-compromise based on doubt as to collectibility usually must equal or exceed a taxpayer's reasonable collection potential in order to be accepted. Internal Revenue Manual (IRM) pt. 5.8.1.1.3(3) (Sept. 23, 2008).[8]

As pertinent here, part 5.8.4.4.1 of the IRM (Sept. 23, 2008) provided that a taxpayer's reasonable collection potential is the sum of (1) the taxpayer's net realizable equity in assets (net realizable equity) and (2) the amount collectible from the taxpayer's expected future income after allowing for payment of

---

[8]Unless otherwise indicated, all IRM references are to the version of the IRM that was in effect on the date of petitioner's hearing. Although there were changes made to the IRM that went into effect after that hearing and before respondent issued the notices of determination to petitioner, none of those changes is applicable here except for one change (discussed below).

[*23] necessary living expenses (expected future income). The term "net realizable equity" was defined for purposes of part 5.8.4.4.1 of the IRM (Sept. 23, 2008) to mean "quick sale value * * * less amounts owed to secured lien holders with priority over the federal tax lien." Id. pt. 5.8.5.4.1(1) (Sept. 23, 2008). The term "quick sale value" used in the definition of "net realizable equity" was defined to mean "an estimate of the price a seller could get for the asset in a situation where financial pressures motivate the owner to sell in a short period of time", usually 80-percent of the fair market value of the asset. Id. pt. 5.8.5.4.1(2) and (3).

"Generally, the amount to be collected from future income is calculated by taking the projected gross monthly income, less allowable expenses, and multiplying the difference by the number of months remaining on the statutory period for collection." Id. pt. 5.8.5.6.6(1) (Sept. 23, 2008). Part 5.8.5.6.1(1) of the IRM (Sept. 23, 2008) provided that "allowable expenses" consist of, inter alia, "necessary expenses", as defined in part 5.15.1.7 of the IRM (May 9, 2008). The term "necessary expense" was defined for purposes of part 5.8.5.6.1(1) of the IRM (Sept. 23, 2008) to mean an expense that is "necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." Id. pt. 5.15.1.7(1). Part 5.15.1.7 of the IRM (May 9, 2008) provided in pertinent part:

[*24] (2) There are three types of necessary expenses:

- National Standards

- Local Standards

- Other Expenses

(3) National Standards:  These establish standards for Food, Clothing and Other Items, and Out-of-Pocket Health Care Expenses.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(4) Local Standards:  These establish standards for two necessary expenses:  housing and utilities and transportation.  \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(6) Other - Other expenses may be allowed if they meet the necessary expense test.

National standards and local standards serve as guidelines to provide accuracy and consistency in determining a taxpayer's basic living expenses (discussed below). IRM pt. 5.8.5.6.2(1) (Sept. 23, 2008).

An offer-in-compromise based on doubt as to collectibility that is less than a taxpayer's reasonable collection potential may be accepted where special circumstances exist that warrant acceptance of less than the taxpayer's reasonable collection potential.  Id. pt. 5.8.1.1.3(3) (Sept. 23, 2008).  As pertinent here, such special circumstances exist where requiring the taxpayer to pay the full amount of

**[*25]** the taxpayer's reasonable collection potential would cause the taxpayer

economic hardship within the meaning of section 301.6343-1, Proced. & Admin.

Regs. See IRM pt. 5.8.4.3(4) (Sept. 23, 2008), 5.8.11.2.1 (Sept. 23, 2008).

Section 301.6343-1(b)(4), Proced. & Admin. Regs., provides in pertinent part:

> (4) Economic hardship.--(i) General rule.--The levy is creating an economic hardship due to the financial condition of an individual taxpayer. This condition applies if satisfaction of the levy in whole or in part will cause an individual taxpayer to be unable to pay his or her reasonable basic living expenses. The determination of a reasonable amount for basic living expenses will be made by the director and will vary according to the unique circumstances of the individual taxpayer. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living.
>
> (ii) Information from taxpayer.--In determining a reasonable amount for basic living expenses the director will consider any information provided by the taxpayer including–
>
> (A) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else;
>
> (B) The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed);

**[\*26]**           (C) The cost of living in the geographic area in which the taxpayer resides;

         (D) The amount of property exempt from levy which is available to pay the taxpayer's expenses;

         (E) Any extraordinary circumstances such as special education expenses, a medical catastrophe, or natural disaster; and

         (F) Any other factor that the taxpayer claims bears on economic hardship and brings to the attention of the director.

In the notices of determination, the Appeals Office determined that petitioner's reasonable collection potential was $278,117.96, i.e., the sum of (1) net realizable equity of $199,865, which the settlement officer calculated on the basis of the assets and the equity therein that petitioner showed in petitioner's first Form 433-B, and (2) expected future income of $78,252.96, which the settlement officer calculated on the basis of the gross business income and business expenses that petitioner showed in petitioner's second Form 433-B.[9] It is

---

[9]It is noteworthy that the financial information that petitioner showed in petitioner's first Form 433-B differed significantly from the financial information that he showed in petitioner's second Form 433-B. Nevertheless, in her May 21, 2010 letter, the settlement officer stated that the financial information that petitioner showed in petitioner's second Form 433-B did not change his reasonable collection potential from that which she calculated on the basis of the financial information that petitioner showed in petitioner's first Form 433-B. It is not clear why the settlement officer made that statement.

(continued...)

[*27] not clear why the Appeals Office determined the amount of petitioner's reasonable collection potential in part on the basis of financial information that petitioner showed in petitioner's first Form 433-B and in part on the basis of financial information that he showed in petitioner's second Form 433-B.

As discussed above, the Appeals Office used the assets and the equity therein that petitioner showed in petitioner's first Form 433-B, which he submitted to the settlement officer on February 24, 2009, to determine the amount of petitioner's net realizable equity. It is not clear why. Part 5.8.5.3.2(1) of the IRM (Sept. 23, 2008) appears to have required the Appeals Office to determine the amount of petitioner's net realizable equity by using the assets and the equity therein that petitioner showed in petitioner's second Form 433-B, which he submitted to the settlement officer on April 6, 2010.[10]

---

[9](...continued)
The settlement officer calculated petitioner's reasonable collection potential to be approximately $846,407 on the basis of the financial information that petitioner showed in petitioner's first Form 433-B. Using the same assumptions that the settlement officer made in calculating petitioner's reasonable collection potential on the basis of the financial information that petitioner showed in petitioner's first Form 433-B, it appears that petitioner's reasonable collection potential would have been approximately $251,757 on the basis of the financial information that petitioner showed in petitioner's second Form 433-B.

[10]Part 5.8.5.3.2 of the IRM (Sept. 23, 2008) provided in pertinent part: "If during the processing of the offer, the financial information becomes older than 12 months, contact should be made with the taxpayer to update the information."

[*28] In addition, the Appeals Office determined that petitioner had $87,063 in net realizable equity in his accounts receivable. In his March 4, 2010 letter and his March 26, 2010 letter, Mr. Pyper claimed that the amount of petitioner's net realizable equity in his accounts receivable was approximately 10-percent of the total amount of those accounts receivable. That is because, according to Mr. Pyper, each of the subcontractors that petitioner hired to work on the construction projects to which petitioner's accounts receivable are attributable held a mechanic's lien on each of those accounts receivable in an amount that was equal to approximately 90-percent of the total of any such accounts receivable attributable to each such contractor. The record does not establish that the settlement officer investigated (1) whether any of the subcontractors that petitioner hired to work on the construction projects to which petitioner's accounts receivable are attributable held a mechanic's lien on a portion of petitioner's accounts receivable and (2) the significance of any such mechanic's liens on the valuation of petitioner's net realizable equity in his accounts receivable.

In petitioner's second Form 433-B, petitioner showed, inter alia, that he had gross business income and business expenses of $26,560 and $24,929.43, respectively, for the one-month period that began on February 28, 2010, and that ended on March 31, 2010. The Appeals Office used only those respective

[*29] amounts of gross business income and business expenses that petitioner showed for the one-month period that began on February 28, 2010, and that ended on March 31, 2010, to determine the amount of petitioner's expected future income. It is not clear why. Part 5.8.5.3.2(7) of the IRM (Sept. 23, 2008) appears to have required the Appeals Office to use petitioner's gross business income and business expenses for the most recent three months to determine the amount of petitioner's expected future income.[11]

In addition, the Appeals Office did not take into account any personal income or any personal expenses of petitioner in determining the amount of petitioner's expected future income.[12] That is because petitioner did not submit Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals (Form 433-A), which would have included that

---

[11]Part 5.8.5.3.2(7) of the IRM (Sept. 23, 2008) provided in pertinent part that a settlement officer assigned to investigate an offer-in-compromise should request from self-employed individuals "proof of gross income * * * for the prior three months" and should "Compare average earnings to the amounts declared on the CIS [i.e., Form 433-B, Collection Information Statement for Businesses]."

[12]There are references in the record to certain mortgage loans on petitioner's residence. However, the Appeals Office did not factor petitioner's obligation to make payments with respect to those loans into its calculation of petitioner's expected future income. Nor did the Appeals Office factor the value of petitioner's residence into its calculation of petitioner's net realizable equity.

[*30] information.[13]  It is not clear how the Appeals Office could have calculated an accurate amount of petitioner's expected future income without taking into account any personal income or any personal expenses of petitioner.

In the notices of determination, the Appeals Office stated that its calculation of petitioner's reasonable collection potential, inter alia, did "not include any assets * * * [petitioner] ha[s] personally." Because the Appeals Office calculated petitioner's net realizable equity on the basis of the assets and the equity therein

---

[13]Because petitioner failed to submit Form 433-A after he was directed to do so by the settlement officer in her March 9, 2010 letter, he is not before us with so-called clean hands.  If the Appeals Office had rejected petitioner's offer-in-compromise on the ground that petitioner failed to provide the settlement officer with certain requested financial information, respondent could have argued here that that was an adequate ground for the Appeals Office to have rejected petitioner's offer-in-compromise.  See, e.g., Sullivan v. Commissioner, T.C. Memo. 2012-337; Wright v. Commissioner, T.C. Memo. 2012-24; Huntress v. Commissioner, T.C. Memo. 2009-161.  The Appeals Office did not reject petitioner's offer-in-compromise on that ground, however.  As a result, in determining whether to sustain or reject the Appeals Office's determinations, we must consider the ground(s) upon which it relied in making those determinations in the notices of determination.  See Jones v. Commissioner, T.C. Memo. 2012-274.

**[*31]** that petitioner showed in petitioner's first Form 433-B,[14] that statement is

correct.[15] It is not clear how the Appeals Office could have calculated an accurate

amount of petitioner's net realizable equity without taking into account the

amounts of certain mortgage loans on petitioner's residence.[16]

Finally, we believe that in both Form 656 and Mr. Pyper's March 4, 2010

letter to the settlement officer petitioner and Mr. Pyper raised issues regarding the

economic hardship[17] that petitioner would suffer if the Appeals Office were to

reject his offer-in-compromise.[18] Form 656 stated in pertinent part: "This is the

---

[14]Although the Appeals Office calculated petitioner's net realizable equity on the basis of the assets and the equity therein that petitioner showed in petitioner's first Form 433-B, that office calculated petitioner's expected future income on the basis of the gross business income and business expenses that petitioner showed in petitioner's second Form 433-B.

[15]See supra notes 5 and 12.

[16]See supra notes 5 and 12.

[17]As discussed above, economic hardship exists when a taxpayer is unable to pay his or her reasonable basic living expenses. See sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. Such basic living expenses include expenses necessary, inter alia, for the production of income. See sec. 301.6343-1(b)(4)(ii)(B), Proced. & Admin. Regs.

[18]Even if petitioner and Mr. Pyper had not raised the issue of economic hardship in both Form 656 and Mr. Pyper's March 4, 2010 letter, part 5.8.4.2(1) of the IRM (June 1, 2010), which became effective after petitioner's hearing and before respondent issued the notices of determination to petitioner on June 23, 2010, provided in pertinent part that the Appeals Office should consider the issue

(continued...)

[*32] worst economy I have seen in 40 years; I have not shown a profit since 2000 and am just keeping my business open to keep my reputation intact in case there is a recovery." Mr. Pyper's March 4, 2010 letter to the settlement officer stated in pertinent part:

> If the taxpayer had to immediately liquidate his equipment to meet his obligations to the Internal Revenue Service this could place an unreasonable burden on him because it would essentially mean he would have to go out of business. Without this equipment he could not secure additional, meaningful work and would have to lay off employees and resort to government support himself.[19]

The record does not establish that the Appeals Office considered any issues regarding whether petitioner would suffer economic hardship in determining to reject petitioner's offer-in-compromise.

On the record before us, we are unable to decide whether we should sustain the determinations in the notices of determination. Accordingly, we shall deny respondent's motion and remand this case to the Appeals Office for clarification and for further consideration.

---

[18](...continued)
of economic hardship, whether identified by the taxpayer or not, when investigating any offer-in-compromise.

[19]Part 5.8.11.2.1(6) of the IRM (Sept. 23, 2008) provides in pertinent part that a finding of economic hardship may be appropriate where "The taxpayer has assets * * * and liquidation to pay the outstanding tax liabilitie(s) would render the taxpayer unable to meet his basic living expenses."

**[*33]** To reflect the foregoing,

An appropriate order will be issued.